## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LAURA P. G.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 3:20-CV-799-MAB**[2] |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), Laura P. G. ("Plaintiff") seeks judicial review of the final agency decision denying her application for Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 423. For the reasons set forth below, the Commissioner's decision is reversed and remanded.

## Procedural History

Plaintiff applied for SSI on February 15, 2017 (Tr. 83). Plaintiff's claims proceeded to a hearing before Administrative Law Judge ("ALJ") Kathryn Preston, who issued an unfavorable decision on July 23, 2019 (Tr. 19-32). Plaintiff exhausted her administrative remedies and filed a timely complaint in this Court on September 2, 2020, seeking judicial review of the ALJ's decision (Doc. 1).

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).

## Issues Raised by Plaintiff

Plaintiff argues the ALJ failed to account for her deficits in concentration, persistence, or pace in the residual functional capacity ("RFC") determination.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order. 20 C.F.R. § 416.920(a)(4). The first question is whether the claimant is presently engaged in substantial gainful activity? *Id.* If the answer is yes, then the claimant is not disabled regardless of their medical condition, their age, education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no, and the individual is not engaged in SGA, the analysis proceeds to question two. *Id.* at § 416.920(a)(4).

At question two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is

---

[3] The statutes and regulations pertaining to disability insurance benefits are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

"severe" and expected to persist for at least twelve months? 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At question three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 416.920(e). A claimant's RFC is simply the most the claimant can still do despite their functional limitations and restrictions caused by their physical or mental impairments. 20 C.F.R. § 404.1545(a)(1).

Then at step four, the ALJ must determine whether the claimant retains the RFC to continue performing their past work. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the fifth and final step, where the burden shifts to the commissioner to show whether, based on the claimant's RFC, there are sufficient numbers of other jobs in the local or national economy that the claimant can perform. *Id.* at § 416.920(a)(4)(v). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(g). If the answer is no, the claimant is found disabled. *Id.*

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive " 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e will reverse only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citation and internal quotation marks omitted).

## The ALJ's Decision

The ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date of February 15, 2017 (Tr. 21). Plaintiff has the following severe impairments: panic disorder, bipolar, attention-deficit hyperactivity disorder ("ADHD"), social anxiety disorder, major depressive disorder, borderline personality disorder, alcoholism, persistent depressive disorder, and generalized anxiety disorder (Tr. 22).

The ALJ found Plaintiff does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 23). Plaintiff has a mild limitation in understanding, remembering, or applying information (*Id.*). She has a moderate limitation in interacting with others (*Id.*). Plaintiff has a moderate limitation with regard to concentrating, persisting, or maintaining pace (Tr. 24). And she has a moderate limitation with adapting or managing oneself (*Id.*).

The ALJ found the Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels, but with non-exertional limitations, including: Plaintiff cannot climb ladders, ropes, or scaffolds; Plaintiff should avoid all exposure to unprotected heights and use of dangerous moving machinery; Plaintiff is able to perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements involving only simple work-related decisions and routine workplace changes; and Plaintiff is able to perform work that is isolated from the public, with only occasional interaction with coworkers (Tr. 25).

The ALJ found that considering Plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform (Tr. 31). The ALJ concluded Plaintiff has not been under a disability since February 15, 2017, the date of her application (Tr. 32).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary is directed at Plaintiff's arguments.

### 1. Agency Forms

Plaintiff completed a disability report on March 23, 2017, in which she states she suffers from the following conditions: bipolar 2, bipolar 1 + ADHD, generalized anxiety disorder, post traumatic stress disorder, ADHD, depression, z63.8, z56.9, panic disorder, fainting, borderline personality disorder, and mild hearing problems (Tr. 187). Plaintiff is prescribed Concerta for ADHD, Effexor for anxiety and depression, Lamictal for bipolar disorder and anxiety, Rexulti for anxiety and depression, and Trazadone for insomnia (Tr. 190).

Plaintiff completed a function report on April 3, 2017, in which she states her anxiety can cause her to faint, which in turn, causes her to panic and "leave" without telling anyone (Tr. 199). Plaintiff states she is a "slow learner" and has difficulty focusing, which has caused managers and coworkers to become frustrated (*Id.*). Also, Plaintiff has depression and sometimes cannot stop crying, which causes her to hide (*Id.*). From the time Plaintiff wakes up until the time she goes to sleep, she is "very unproductive" because of her depression (Tr. 200). She generally wakes up, takes her medicine, eats, and finds ways to distract herself (*Id.*). Stress causes Plaintiff to be depressed until she "shut[s]" down and goes to sleep (*Id.*).

Plaintiff has a snake, which she feeds and gives fresh water, but she sometimes struggles with motivation to better care for her snake (*Id.*). Because of her conditions, Plaintiff does not wear clean clothes or bathe regularly, she does not wash or brush her hair for long periods of time and does not brush her teeth every day (*Id.*). Plaintiff can prepare simple meals that do not require much effort (Tr. 201). Plaintiff can physically complete most household chores but it takes her a long time and she often does not complete them (Tr. 201). Plaintiff does not go outside often (Tr. 202). She grocery shops for her family (Tr. 202).

Plaintiff's hobbies include video games, reading, watching television, playing with pets, and being with her friends and family (Tr. 203). Plaintiff's conditions cause her to have little to no motivation (*Id.*). Plaintiff spends times with others by watching sports at bars and grills with live music and at restaurants (*Id.*). She attends therapy at least once each week (*Id.*).

Plaintiff has a tendency to be sensitive and overreact due to her conditions (Tr. 204). She has difficulty completing tasks, concentrating, understanding, and following instructions (*Id.*). Plaintiff follows written instructions well but does not follow spoken instructions very well (*Id.*). Plaintiff is "always respectful" with authority figures and has never been fired from a job because of problems getting along with other people (Tr. 205). Plaintiff does not handle stress well—she tends to panic and leave when situations become too stressful (*Id.*). Plaintiff does not handle changes in routine well (*Id.*).

Plaintiff's mother also completed a function report, which is dated April 4, 2017 (Tr. 208). Plaintiff's mother generally described Plaintiff's functioning consistent with

Plaintiff's report. Plaintiff and her mother watch television, color, talk, and periodically read religious books (Tr. 208). According to Plaintiff's mother, Plaintiff has panic attacks, anxiety, and a history of fainting (*Id.*). Plaintiff is "very extraordinary in sensitivity," is depressed, has no motivation to keep her room and bathroom clean, and is very defensive (*Id.*).

There are days when Plaintiff struggles to get out of bed and on "better days," Plaintiff will run errands and help with chores, but she does not "stick to it real long" (Tr. 209). Plaintiff becomes overwhelmed with too many instructions and her depression limits her ability to concentrate and complete tasks (Tr. 213). Plaintiff's understanding is "clouded by black & white thinking" (*Id.*). Her insecurities, anxiety, self-perception, defensiveness, and inability to "read" others' "language" interferes with her social skills (*Id.*). Plaintiff can generally pay attention for about five to ten minutes before she is distracted (*Id.*). Plaintiff has difficulty following through completely with instructions (*Id.*). Too many spoken instructions overwhelm Plaintiff (*Id.*).

Plaintiff is outspoken and very defensive with authority figures (Tr. 214). Plaintiff's mother "suspect[s]" she has been fired from a job because of problems getting along with others (*Id.*).

Subsequent disability reports state Plaintiff experienced an increased lack of personal care, social activities, and ability to complete household duties (Tr. 233). Plaintiff also indicated she wanted to harm herself (*Id.*). Plaintiff also experienced more intense anxiety, depression, and emotional instability (Tr. 240).

On August 13, 2018, Plaintiff completed a Work Activity Report (Tr. 326). She stated she worked at Golf Galaxy, with the assistance of a job coach, but was unable to maintain the employment because of anxiety, panic attacks, fainting, and depression (Tr. 331). She worked at Wal-Mart but was terminated for her "emotions, anxieties, fears, [and] depression" (Tr. 334). Plaintiff also worked at Midwest Petroleum as a stocker, cashier, and cleaner for two weeks (Tr. 336). She worked as a cashier and stocker at Shop n Save but was fired for not being "fast enough" (*Id.*). Plaintiff worked in a call center for twenty minutes but left because of a panic attack (Tr. 337). She worked at a JC Penny's for two weeks but left because of panic attacks (*Id.*).

### 2. *Evidentiary Hearing*

ALJ Kathryn Preston presided over an evidentiary hearing on February 26, 2019 (Tr. 39). Plaintiff was not represented by counsel (Tr. 41, 43).

Plaintiff testified she lives in a house with her parents and 27-year-old brother (Tr. 46). Plaintiff testified she cannot perform any work because of "panic" (*Id.*). Also, she suffered from dizzy spells (Tr. 46-47). Plaintiff has problems taking care of her hygiene (Tr. 48). She has a driver's license and drives to her friend's houses and runs errands (Tr. 48-49). Plaintiff attends live music concerts at bars and usually stays between two and four hours (Tr. 50). She plays video games and watches television (Tr. 51). Plaintiff graduated high school and attended two years of college (Tr. 52). Her courses took place in classrooms (*Id.*).

Plaintiff can perform some household chores like picking up after animals but even looking at dishes makes her anxious (Tr. 51). Plaintiff prepares meals such as pasta

(*Id.*). Plaintiff has good days and bad days (Tr. 49). On a typical day, she wakes up, takes medicine, eats, and then goes back to bed (Tr. 51).

Plaintiff has seen a psychiatrist since she was 14 (Tr. 52). For the four months prior to the hearing, Plaintiff saw Kevin Treloar, a specialist in dialectical behavioral therapy, twice each week (Tr. 52-53). Plaintiff is prescribed Concerta for ADHD, Flexa for depression, Nuralty for anxiety and depression, Lemectil for anxiety, Prednisone for insomnia, and Diazepam for anxiety (Tr. 54).

Plaintiff testified she did not apply for Social Security benefits because she does not want to work—she wants help (Tr. 54). She wants to die every day and cannot function like a normal person anymore (*Id.*).

Plaintiff's witness, "Ms. Bailey," also testified at the hearing (Tr. 54). Ms. Bailey is a service facilitator for the Achievement and Resource Center ("ARC"), where she has worked for 37 years (Tr. 55, 60). Ms. Bailey is not a licensed practical counselor, but she has a master's degree in "school psych" (Tr. 56). Ms. Bailey testified the explanation of benefits in this case does not make sense because it lists depression but not anxiety (Tr. 56-57). Ms. Bailey noted that Plaintiff's global assessment of functional ("GAF") score has been as low as 25-35, which "says a lot" (Tr. 58). Plaintiff gets distracted and experiences increased physical agitation, unrealistic or excessive worry, and restlessness (*Id.*). She also has difficulty remembering and understanding information (*Id.*). Plaintiff has difficulty concentrating, interacting with others, socializing, controlling her behavior, and adapting to new situations (Tr. 59-60). Plaintiff could not handle a job without a job coach (Tr. 59).

Ms. Bailey testified Plaintiff wants to succeed and that her claims are "legitimate" (Tr. 60). After 37 years with ARC, Ms. Bailey can identify when there are "true issues" at hand (Tr. 60).

Debbie G., Plaintiff's mother, also testified at the hearing (Tr. 41, 61). Debbie stated Plaintiff is "very depressive," has burned herself, and attempted suicide the previous July (Tr. 61). In response to the suicide attempt, Plaintiff underwent therapy (Tr. 62). When Plaintiff was growing up, she had difficulty making friends and is extremely sensitive (*Id.*). Debbie has experienced Plaintiff crying hysterically on the phone before interviews and Plaintiff "just couldn't do it" (*Id.*). Debbie described Plaintiff as "Jekyll and Hyde"(Tr. 62).

Vocational expert ("VE") Darrell Taylor testified next (Tr. 63). The VE testified that in unskilled work, even one absence in a one-month period that occurred over two consecutive months would result in termination (Tr. 64-65). Two or more absences in a given month would also result in termination (Tr. 65). An individual would be terminated if he or she is off task for 10 percent of a workday (Tr. 65).

The ALJ asked the VE to consider an individual of the same age, education, and work experience as Plaintiff who can: never be able to climb ladders, ropes, and scaffolds; needs to avoid the use of dangerous machinery and exposure to unprotected heights; can perform simple, routine, and repetitive tasks in a work environment that is free of fast-paced requirements involving only simple work-related decisions and routine workplace changes; can perform work that is isolated from the public and with only occasional supervision and occasional interaction with coworkers (Tr. 65). The VE testified an

individual with these limitations would be able to perform work in the national economy (Tr. 65-66). The VE identified 300,000 medium dishwasher positions; 160,000 medium, unskilled hand packager positions; and 400,000 medium, unskilled cleaner positions (*Id.*). The VE testified his testimony is consistent with the Dictionary of Occupational Titles ("DOT") and its companion publication, the SCO (Tr. 66).

Tom G., Plaintiff's father, testified next (Tr. 66). He testified Plaintiff has been hired before but could not even get through the orientation because of her anxiety (Tr. 66-67). If Plaintiff had her way "she would be working and self-sufficient" (Tr. 67).

### 3. *Medical, Employment, And Educational Records*

On January 23, 2009, Plaintiff presented to psychiatrist Dr. Darrin Friesen for an initial psychiatric evaluation (Tr. 451). Plaintiff reported she was very depressed and could not concentrate on schoolwork (*Id.*). Neurodivergent symptoms included disturbed sleep and suicidal ideation (*Id.*). Dr. Friesen assessed Plaintiff with depression, PTSD, and ADHD and increased her Zoloft (Tr. 453). Plaintiff saw Dr. Friesen periodically from 2009 through 2018. During subsequent visits, Dr. Freisen also assessed Plaintiff with panic disorder, generalized anxiety disorder, nascent cluster B traits, bipolar 2, borderline personality disorder, hysterical fainting, syncope (fainting), and autism (*See* Tr. 434, 441, 443, 604). Dr. Friesen prescribed Plaintiff medications including Abilify, Effexor, Rexulti, Celexa, Vyvanse, Lamictal, Concerta, Trazadone, Seroquel, Diazepam, Trintellix, Latuda, and Zoloft (*See* Tr. 427, 429, 434, 437, 39, 442, 447, 538, 539).

On February 18, 2009, Plaintiff mentioned suicidal thoughts and difficulty concentrating during her session with Dr. Friesen (Tr. 449-50). On March 6, 2009, Plaintiff

stated she fainted at school (Tr. 447). On March 30, 2009, Plaintiff stated she had another fainting episode (Tr. 446).

On April 30, 2009, Plaintiff was admitted to St. John's Mercy Medical Center after her father found a notebook in which Plaintiff wrote goodbye notes to friends and wrote about being raped at the age of five (Tr. 366). Plaintiff's mood and effect were sad and blunt and she had recently passed out from anxiety (Tr. 367). Plaintiff appeared disheveled and unkempt (*Id.*). She was uncooperative, evasive, and nonverbal (*Id.*). She had poor focus and insight deficit (*Id.*). Plaintiff had hypersomnia and nightmares and never felt rested (*Id.*). She reported she still felt suicidal and planned on killing herself by walking in front of a car on the highway (Tr. 369).

On May 1, 2009, Plaintiff stated she had experienced suicidal ideations since fifth grade (Tr. 377). Plaintiff had few friends and was bullied at school (*Id.*). Plaintiff reported she was sexually molested when she was five years old (*Id.*). Plaintiff felt somewhat ignored by her parents due to their obligations to Plaintiff's brother who was diagnosed with Asperger's (*Id.*). Plaintiff met with a therapist for the first time during the previous summer (*Id.*). Plaintiff stated the therapy did not help and she eventually stopped seeing the therapist (*Id.*). Plaintiff began seeing Dr. Friesen in January 2017 and was diagnosed with PTSD (*Id.*). She was prescribed Zoloft and Xanax (*Id.*). Plaintiff reported the medications "kinda, sorta" worked (*Id.*). Plaintiff continued to experience suicidal thoughts and intermittent anxiety symptoms (*Id.*).

Plaintiff was having difficulty maintaining her grades and she began taking Concerta for ADHD, which "did not go well" (*Id.*). Plaintiff reported stressors at home,

including conflicts with her mother (*Id.*). Plaintiff began writing goodbye notes to her friends about one to two weeks before her admission to the hospital (*Id.*). She said she had thoughts of jumping in front of a car on the highway (*Id.*).

On mental status exam, Plaintiff was fully awake, alert, and generally cooperative (Tr. 378). Plaintiff's speech had regular rate and rhythm and her thoughts were logical and sequential (*Id.*). Plaintiff acknowledged having experienced suicidal ideation of a fairly chronic duration (*Id.*). "Plaintiff acknowledged having seemingly planned a suicide, but at the same time one got a sense that this as less perhaps thought out as much as perhaps thought about" (*Id.*). Plaintiff's "overall affect seemed much more at ease than someone who was imminently suicidal" (*Id.*). Plaintiff sated being in the hospital was a "wakeup call" and she denied ongoing suicidal intent (*Id.*). There was no evidence of any psychosis; Plaintiff was oriented to person, place, time, and situation; immediate, recent, and remote memory seemed grossly intact; overall level of intellectual functioning was average based on responses to questions; and overall insight and judgment was "felt to be rather questionable" (*Id.*).

Plaintiff was diagnosed with major depressive episode, rule out parent-child problem, rule out adjustment disorder with mixed features (Tr. 378). Her current level of psychosocial stressor was rated as severe and her GAF was 25 (Tr. 379). Plaintiff was admitted to the adolescent psychiatry service (*Id.*).

On May 7, 2009, Plaintiff told Dr. Friesen about her hospitalization at St. John's and stated it was "really hard to carry on every day" (Tr. 445). On May 20, 2009, Plaintiff stated she was missing a lot of school and that she had difficulty focusing (Tr. 444). On

September 17, 2009, Plaintiff reported more fainting spells (Tr. 443). On January 12, 2010, Plaintiff stated it was really hard to concentrate and that she experienced fainting spells every two to three weeks (Tr. 442). On April 22, 2010, Plaintiff stated she had trouble getting out of bed (Tr. 441). On July 24, 2010, Plaintiff reported a fainting spell and stated she could not "remember stuff" (Tr. 440). On October 20, 2010, Plaintiff told Dr. Friesen she thought about death, daily (Tr. 439). On March 1, 2011, Plaintiff stated she had difficulties with her short-term memory (Tr. 437). On September 7, 2011, Plaintiff stated that she was still having problems with her short-term memory (Tr. 436). On May 1, 2012, Plaintiff told Dr. Friesen she was fainting more (Tr. 435).

Plaintiff attended therapy sessions at St. Louis Behavioral Medicine Institute on January 4, 2012 (Tr. 402), December 17, 2012 (Tr. 407), December 19, 2012 (Tr. 411), December 20, 2012 (Tr. 409), December 28, 2012 (Tr. 406), January 2, 2013 (Tr. 404), January 3, 2013 (Tr. 403), March 13, 2013 (Tr. 416), March 20, 2013 (Tr. 415), March 27, 2013 (Tr. 414), January 20, 2014 (Tr. 413), and January 29, 2014 (Tr. 412). The notes are largely illegible but at many of the sessions, Plaintiff was cooperative and engaged; she experienced symptoms of anxiety, depression, and panic; she was progressing towards her goals; suicidality and homicidality were absent; and her mental status had no change (*see Id.*).

On July 6, 2012, Plaintiff was admitted to Anderson Hospital after taking an unknown amount of Benadryl and ibuprofen and texting her friends goodbye (Tr. 522). Plaintiff was assessed with polypharmacy overdose, suicidal gesture, bipolar disorder, depression, anxiety, and PTSD (Tr. 524). Plaintiff said she "always feels like she would

like to die" but did not feel like she would harm herself at the time of her examination (Tr. 525).

On July 7, 2012, Plaintiff was transferred from Anderson Hospital to St. Elizabeth's Hospital (Tr. 382). Plaintiff reported she felt like she was a burden to her parents and others and felt the burden would be relieved if she committed suicide (*Id*.). Plaintiff stated she began having suicidal ideation around age 10 (*Id*.). This was her fourth suicide attempt (*Id*.). The first three attempts occurred between ages 10 and 14 (*Id*.). Plaintiff felt depressed and anxious on most days (*Id*.). She denied any other emotional or psychological symptoms (*Id*.). On psychiatric review, Plaintiff reported decreased sleep, feelings of worthlessness, increased irritability, and low activity level (Tr. 383). Plaintiff reported frequent mood swings and she denied symptoms of psychosis, reported a good mood, and denied anhedonia (*Id*.). The medical provider was unable to elicit clear evidence of manic phase pathology (*Id*.).

On mental status examination, Plaintiff had normal eye contact and psychomotor activity (Tr. 384). Her speech was normal in rate and volume and goal-directed (*Id*.). Her mood was depressed and anxious (*Id*.). When Plaintiff was told she was not being discharged that day, she sobbed and cried loudly and "dramatically" insisted she be discharged (*Id*.). Plaintiff denied suicidal or homicidal ideations and denied being an injury risk to herself or others (*Id*.). Plaintiff denied auditory or visual hallucinations or delusions (*Id*.). She had no objective signs of psychosis or dissociative states (*Id*.). Plaintiff was cognitively intact and her concentration was excellent (*Id*.). Plaintiff seemed to be of average intelligence and average fund of knowledge (*Id*.). Her insight and judgment were

fair and "[c]ertainly, a suicide attempt reflect[ed] poor judgment" (*Id*.). Plaintiff was diagnosed with depression, recurrent, and moderate with a history of bipolar disorder and attention deficit disorder; personality disorder, not otherwise specified; moderate chronic mental illness; and a GAF of 40 (Tr. 382.).

Plaintiff was discharged on July 11, 2012 with diagnoses of major depression, recurrent, moderate, much improved; rule out Asperger's; mixed personality disorder with hysterical and with histrionic and borderline traits; moderate stress with chronic mental illness and significant character pathology; and a GAF of 45 (Tr. 385). Plaintiff's provider noted, "The probability that this lady has bipolar disorder is diminishingly low. I could not elicit symptoms of mania from her. She was clearly manifesting some symptomology of depression at initial presentation that resolved within hours and with complete fullness. For this reason I believe that she may have significant character pathology of a histrionic and borderline type that might be the predominant clinical element" (Tr. 386).

A Behavior Action Plan dated October 17, 2012 states Plaintiff's emotional disability impacts her ability to handle social and academic frustration effectively (Tr. 309). Plaintiff became "overwhelmed at times, with social and academic demands" (*Id*.). The following behaviors were evident: excessive worrying, somatization, poor self-confidence/self-esteem; distractibility; misperception of others' comments and viewpoints; black and white thinking patterns; perseveration on perceived injustices, actions of other, etc.; argumentative behaviors; and fainting spells (*Id*.).

On November 9, 2012, Plaintiff told Dr. Friesen she had mentioned suicide to a friend (Tr. 433). On July 19, 2013, Plaintiff reported she faints from stress (Tr. 432). On January 29, 2014, Plaintiff told Dr. Friesen she had been working at a grocery store for three weeks but was terminated because she was slow to learn (Tr. 430). She was also terminated from a job at a gas station (Tr. 431).

On October 20, 2014, Plaintiff's former employer wrote a report that states Plaintiff was employed through the company for an assignment on July 25 and worked seven and a half hours (Tr. 425). Plaintiff was offered two other assignment that she declined to take (*Id.*). Plaintiff accepted an assignment for September 11, 2015 but did not show up or call to advise she could not make it (*Id.*). Plaintiff was inactivated on September 14, 2015 due to her "unreliability" (*Id.*).

On March 1, 2015, Plaintiff told Dr. Friesen that Abilify was really helping (Tr. 428). On August 12, 2015, Dr. Friesen noted that Plaintiff was crying in the waiting room and Plaintiff had lost a job at Wal-Mart for displaying grief at work (Tr. 429). She had also failed three classes (*Id.*). On September 18, 2015, Dr. Friesen's progress notes state, "can't hold a job – most recently had a ½ day shift as a painter … Left Home Depot after 2nd [illegible] with nasty customer" (Tr. 427). Plaintiff stated she could not hold a job because it "becomes too much for no reasons" (*Id.*). The note also states, "Does need to get on social security" (*Id.*).

On April 27, 2016, Plaintiff told Dr. Friesen she was not sleeping at night (Tr. 538). She was helping out at a bar and spending time with friends (*Id.*). Although her anxiety

had not "been bad" she was still experiencing depression (*Id.*). She still had some fear of work "unless it is as a cashier, at a small business or Kohl's" (*Id.*).

On August 29, 2016, Dr. Friesen spoke with Plaintiff, who stated her depression and anxiety were getting worse but the Rexulti was helping (Tr. 539).

On September 29, 2016, Plaintiff presented to the emergency department at Anderson Hospital and stated she has syncope with her anxiety attacks (Tr. 465). The physician's impressions included syncope, psychogenic and anxiety (Tr. 468).

On December 1, 2016, Plaintiff's mother told Dr. Friesen she suspected Plaintiff was burning herself (Tr. 537). Plaintiff's mother stated Plaintiff had lost three to four jobs because "she just stops going to work" because Plaintiff thinks she is not smart enough (*Id.*). Plaintiff's mother stated Plaintiff goes to bars and to the park (*Id.*). Dr. Friesen noted Plaintiff's thought content was suicidal (passive), Plaintiff had poor insight and fair judgment, and her mood was euthymic (*Id.*).

During the relevant period, Plaintiff received vocational rehabilitation services from Challenge Unlimited (Tr. 314-25, 596). Plaintiff also received assistance from a rehabilitation counselor with the Illinois Department of Human Services-Division of Rehabilitation Services (Tr. 312).

On August 22, 2017, Dr. Friesen noted Plaintiff had worked at Golf Galaxy for a couple of weeks but did not go to work twice because of her anxiety (Tr. 598). Plaintiff was concerned she would lose the job due to panic (Tr. 598). Plaintiff stated she panicked at work and before work (*Id.*). Dr. Friesen noted Plaintiff's insight and judgment were poor (*Id.*).

On April 4, 2018, Plaintiff told Dr. Friesen she had worked at Golf Galaxy for six months but anxiety attacks at work eventually led to her quitting (Tr. 604). Plaintiff had missed work often and had "no-call/no-shows" twice because of her anxiety and panic (*Id.*). Dr. Friesen noted Plaintiff's insight and judgment were fair (*Id.*).

On October 12, 2018, Plaintiff began attending therapy at Dynamic Psychotherapy Associates and was treated by therapist Kevin Treloar (Tr. 721). Plaintiff told Mr. Treloar she burned herself with cigarettes, felt she had borderline personality disorder, and did not change her mind easily (*Id.*). Plaintiff was also very anxious about not being able to hold a job and was "panicky" (*Id.*). Plaintiff stated she had begun applying for disability (*Id.*). Plaintiff attended another therapy session on October 19, 2018 and stated she was upset about "where she" was "in life" (Tr. 723). Plaintiff was "ashamed" that her family gave her money (*Id.*).

On November 9, 2018, Plaintiff told Mr. Treloar that her goal is to get a job and gain independence (Tr. 725). On November 13, 2018, Plaintiff told Mr. Treloar she cut her arms and felt her life was "going nowhere" (Tr. 727). Mr. Treloar discussed the possibility of hospitalization or intensive outpatient therapy (*Id.*). On November 16, 2018, Plaintiff told Mr. Treloar she "made a suicidal gesture" (Tr. 729).

On November 29, 2018, Plaintiff told Dr. Friesen she had cut her left wrist to try to end her life (Tr. 659). She reported anxiety attacks and a racing heart (*Id.*).

On November 30, 2018, Plaintiff told Mr. Treloar she felt suicidal every day (Tr. 735). On December 7, 2018, Plaintiff asked Mr. Treloar for a letter to support her disability claim (Tr. 727). He told Plaintiff he had not known her for long enough and that "coming

to therapy with the desire to get money or other resources can mean a diagnosis of malingering" (*Id.*).

On January 11, 2019, Mr. Treloar discussed he had received clinical notes and the case formulation from her psychiatrist (Tr. 747). Plaintiff stated she was working on getting tools to manage her anxiety and she felt it was important before she gets a job (*Id.*). Plaintiff stated her disability hearing was on February 26 and discussed that her getting a job may cause problems in her disability hearing (*Id.*).

On February 1, 2019, Plaintiff told Mr. Treloar her disability hearing was coming up and she was frightened because the last interview was a mess (Tr. 759). On February 5, 2019, Plaintiff told Mr. Treloar, again, she was anxious about the disability hearing (Tr. 761). On February 8, 2019, Plaintiff mentioned the disability hearing during her session with Mr. Treloar and stated she was worried (Tr. 763). On February 12, 2019, Plaintiff told Mr. Treloar her mother thinks Plaintiff lied about being date raped to get disability benefits (Tr. 765). Plaintiff admitted she made up "sexual things" earlier in her life because she wanted attention, including that her uncle touched her inappropriately (*Id.*). She told Mr. Treloar she wanted to move out of her house but did not have the means (*Id.*). "Any kind of client responsibility or commitment tends to make her feel trapped and anxious" (*Id.*). On February 15, 2019, Plaintiff told Mr. Treloar she was anxious about the disability hearing and that she has spiraled into anxiety about "all sorts of things" (Tr. 767). On February 19, 2019, Plaintiff told Mr. Treloar she was upset about the disability hearing because she had to describe failures at various jobs (Tr. 769). On February 22, 2019, Plaintiff told Mr. Treloar her parents think she is faking some of her symptoms,

which is upsetting (Tr. 771). Plaintiff was tired and stressed and stated the disability process was humiliating (*Id.*).

### 4. *Opinion Evidence*

### a. **William Schwartz**

On November 1, 2015, Licensed Clinical Professional Counselor William Schwartz created a summary of counseling services pertaining to Plaintiff (Tr. 421). Mr. Schwartz noted Plaintiff had bipolar 1 disorder, ADHD, high expressed emotional level within family, and other problems related to employment (*Id.*). Plaintiff's parents initially contacted Mr. Schwartz for an initial session due to ongoing concerns with depression, low motivation, anxiety around performing tasks related to school or work, difficulty regulating emotions with irritability and anger, difficulty dealing with grief related to a past relationship, and difficulty sustaining supportive social connections (*Id.*). Plaintiff identified not being able to sustain employment as one of her most distressing concerns, noting that he confidence was very low after multiple incidences of securing employment that lasted no more than three weeks due to issues with focusing and processing new information, difficulty regulating repetitive negative thoughts of failure, difficulty regulating internal feelings of panic and anxiety, and a history of difficulties regulating emotions with tearful outbursts and surges of anger (*Id.*). Plaintiff's treatment plan was to attend counseling and art therapy sessions weekly or bi-weekly (*Id.*). She attended 13 sessions, making and keeping appointments independently (Tr. 422). Plaintiff's involvement in her therapy sessions was "active and motivated" and she verbalized how strategies developed to address her goals were working or not working for her (*Id.*). There

was a significant break in treatment between September 29, 2015 and November 5, 2015 due to increased depression, but once re-engaged, Plaintiff returned to communicating with her counselor in a responsive way (*Id.*).

Mr. Schwartz noted Plaintiff continued to struggle with seeking and maintaining employment (Tr. 422). "Her level of anxiety about jobs that had elements similar to the jobs she had previous problem with served as a barrier to job search" (*Id.*). During sessions, Plaintiff identified two types of employment she felt held realistic possibilities, including a house painter and a cashier at a department store (Tr. 422-23).

Mr. Schwartz stated Plaintiff demonstrated motivation to make steps toward her goals but also displayed an emotional impulsivity when feeling like a challenge was beyond her ability (Tr. 423). Plaintiff also demonstrated this impulsivity when asked to anticipate how she might respond to individuals in a workplace who do not seem supportive (*Id.*). Plaintiff was highly sensitive to personality traits in others that she felt she may not get along with (*Id.*). Plaintiff had difficulty with emotions when she felt frustrated, misunderstood, or did not trust the interactions of others (*Id.*). Plaintiff experienced this while working with an agency that was placing her in temporary positions (*Id.*). When she missed a scheduled job, Plaintiff felt there was a miscommunication, but when the agency representative on the phone exhibited an accusatory tone, Plaintiff gave up on an effort to explain herself (*Id.*). When Plaintiff joined a team of painter, she struggled to keep up with the expectation of the first day, was surprised by the physical rigor of the work, and reported she did not feel any support from the team (*Id.*). Plaintiff stated her anxiety peaked and asked to be dismissed (*Id.*).

Plaintiff was offered a position as a cashier but did not make it to her first day of employment due to high levels of anxiety (Tr. 423). Plaintiff had stressful interactions with family and built up a negative attitude about herself and she was unable to go into work (*Id.*).

Around November 5, Plaintiff reported having a very specific suicidal thought, which she communicated with a friend who then told Plaintiff's parents (Tr. 423). At a subsequent session with Dr. Friesen, Plaintiff stated she was no longer preoccupied with self-harm (Tr. 424).

On March 29, 2017, Mr. Schwartz completed another summary of counseling services to assist with determination of eligibility for disability (Tr. 570). Plaintiff's current diagnoses included bipolar 1 disorder, ADHD, High Expressed Emotional Level within Family, "Other Problems Related to Employment," and "Other Personal Risk Factors" (*Id.*). Mr. Schwartz noted Plaintiff was able to recognize barriers that had impacted her ability to perform academically and to meet personal goals of making steps toward living on her own (Tr. 571). Plaintiff had transitioned high schools after struggling socially, behaviorally, and academically (*Id.*). Plaintiff lived in an apartment for a brief period but was unable to maintain the living situations after a relationship ended and her depression and anxiety symptoms worsened (*Id.*). Plaintiff had not been able to maintain employment for more than three months, with most of her job efforts lasting only a few days to a few weeks, due to her anxiety (*Id.*). Plaintiff was growing more accepting of the idea of a job coach who could assist her getting through training periods of a new job (*Id.*).

Also, Mr. Schwartz noted Plaintiff "continued to struggle with the process of seeking and maintaining employment. Her level of anxiety about jobs that had elements similar to the jobs she had previous problems with served as a barrier to job search" (Tr. 572). During therapy, Plaintiff identify two types of employment she felt held realistic possibilities, including house painting and working at Kohl's (*Id.*). Plaintiff had obtained a voluntary position at a hospice but was unable to maintain the position after a family death (*Id.*). Plaintiff recognized that once she feels incapable of managing her emotions or meeting job tasks, she has difficulty directly communicating and terminates her employment (*Id.*). Plaintiff was eventually able to return to the hospice position (*Id.*).

In the fall of 2016, Plaintiff worked at a haunted house but only lasted two hours on her first day because she became overwhelmed (*Id.*). In the fall, Plaintiff's overall mood and motivation to meet basic daily responsibilities declined (*Id.*).

Mr. Schwartz noted Plaintiff's social and emotional needs were complex. (Tr. 573). When she felt stable and able to focus, she demonstrated true motivation and increased confidence (*Id.*). Plaintiff displayed an emotional impulsivity when faced with challenges (*Id.*). She also demonstrated impulsivity when asked to anticipate how she might respond to individuals in a workplace who do not seem supportive (*Id.*). Plaintiff appeared highly sensitive to personality traits in others that she felt she may not get along with (*Id.*). Plaintiff had difficulties holding her emotions in check when she felt frustrated or misunderstood or did not trust the interactions of others (*Id.*). When Plaintiff struggled with depressed moods, anxiety, or personal setbacks, she displayed hopelessness, low self-esteem, and low motivation (*Id.*). Mr. Schwartz concluded, "Without continued

counseling support, medication monitoring by her physicians, and some form of job coaching to assist Plaintiff in advocating for her needs on the jobsite and managing her stress level and self messages while meeting her new responsibilities, it will be very difficult for [Plaintiff] to progress to the point of attaining her goal of maintaining employment and living more independently" (*Id.*).

On February 16, 2018, Mr. Schwartz completed another summary of Plaintiff's counseling services and impairments (Tr. 649). Plaintiff's diagnoses at the time included bipolar 1 disorder, ADHD, social anxiety disorder, high expressed emotional level within family, "Other problems Related to Employment," "Other Personal Risk Factors," and rule out borderline personality disorder (*Id.*). Mr. Schwartz had no update on Plaintiff's prognosis (Tr. 650).

On September 16, 2018, Mr. Schwartz submitted another summary of Plaintiff's counseling services and impairments (Tr. 632). Plaintiff's current medical diagnoses were bipolar 1 disorder, ADGD, social anxiety disorder, high expressed emotional level within family, "Other Problems Related to Employment," and "Other Personal risk Factors" (*Id.*). Between March 2018 and September 2018, Plaintiff's therapy sessions focused on supporting Plaintiff with managing symptoms of depression and social and occupational anxiety (*Id.*). Mr. Schwartz's updated prognosis of Plaintiff states Plaintiff's ability to incorporate strategies in response to anxiety and depression remained very difficult (*Id.*). Plaintiff could be very emotionally bright a strong advocate for her needs in some settings, but had poor ability to access coping strategies when her anxiety peaked, when circumstances in her life were negative, when depression symptoms impacted her drive

and motivation, and when her self-esteem was at its lowest (*Id.*). Mr. Schwartz wrote, "While this therapist is very careful never to send the message to [Plaintiff] that she is incapable and that taking on the challenge of investing in any meaningful activity for financial gain or social/personal growth and gain is not possible, it is very clear that the complex nature of [Plaintiff's] mood and anxiety issues continue to impact her both in times when there is a clear event/trigger to negative thought patterns, and seemingly at times when the cycle of depression/mood symptoms and anxiety increase without a clear trigger (*Id.*). Mr. Schwartz noted Plaintiff continued to show patterns that suggest she would need intense support to select a form of employment that is realistic and to maintain successful employment when her symptoms are most disruptive (Tr. 636). Mr. Schwartz concluded that Plaintiff "will continue to have significant difficulty maintaining a full time employment position without such support and will likely need this level of support throughout her adult life if she is not able to develop more internal resources and strategies to counter the impact of her anxiety and depression episodes" (*Id.*). She would "likely need an employment arranged that can accommodate [her] need to take breaks when needed to recover, end shifts if unable to recover, meetings to clarify management expectations or negotiate on-job concerns" (*Id.*).

### b.  Dr. Darrin S. Friesen

In January 2011, Dr. Friesen wrote a detailed and lengthy letter summarizing Plaintiff's impairments and their negative effects on her educational experiences (Tr. 696). He listed Plaintiff's diagnoses as bipolar 2 disorder, ADHD, PTSD, anxiety, and panic disorder (*Id.*). Dr. Friesen stated it was his professional, medical opinion that Plaintiff's

disability had been the ultimate source of her academic struggles on every level (Tr. 698). "She cannot learn when she is in a constant state of situationally heightened anxiety. She cannot learn when she cannot even attend school due to the anxiety. She is even less able to return to school when she finds herself in an inevitable situation of being behind in her classes and not being able to even follow along in a class due to what she missed when away" (*Id.*).

On November 5, 2011, Dr. Friesen wrote another letter in support of Plaintiff attending a school with a therapeutic setting (Tr. 701). He wrote Plaintiff has anxiety attacks that occur in relation to attending school and that she has developed significant, clinical anxiety regarding being in situations where she may have a panic attack, which has impacted her attendance and performance at school (*Id.*).

On September 15, 2017, Dr. Friesen wrote a letter summarizing Plaintiff's conditions (Tr. 597). Dr. Friesen noted Plaintiff struggled with fear, panic, and depression and that despite therapy and significant daily medication, she could not maintain a job (*Id.*). Due to her ADHD and excessive, persistent worry, Plaintiff has difficulty understanding directions, concentrating and retaining information (*Id.*). Plaintiff's thoughts were continually interrupted, which made it difficult for her to focus on tasks (*Id.*). Plaintiff became overwhelmed easily and shut down (*Id.*). Plaintiff had little resilience and change exacerbated her anxiety and made it difficult for her to adapt (*Id.*). Dr. Friesen opined that Plaintiff's underlying conditions that render her disabled are chronic conditions that were being treated as adequately and completely as could be

expected (*Id.*). Dr. Friesen concluded, "It is my professional opinion that [Plaintiff] has a mental impairment that limits her capacity for any employment" (*Id.*).

### c.  Kevin Treloar, MA, DCSW

On February 24, 2019, Plaintiff's therapist, Kevin Treloar, wrote a letter summarizing his treatment of Plaintiff (Tr. 652). Mr. Treloar stated he had been seeing Plaintiff since October 12, 2018 for Cognitive Behavioral Therapy and Dialectical Behavior Therapy (*Id.*). Plaintiff's diagnoses included major depression, moderate; borderline personality disorder; and ambivalence toward work, anger at her parents, and anger at her brother with autism (*Id.*). Mr. Treloar wrote,

> For legal reasons, since this letter is for a Social Security Disability hearing, a rule out diagnosis of Malingering (V65.2) must be considered for the following reasons.

1) The patient began therapy with the intention of gaining Social Security disability and Malingering must be included because symptoms may be exaggerated for financial gain.

2) The patient has remarked on several occasions that her parents say that she is 'faking' her symptoms to avoid work.

3) The patient is able to engage in activities such as karaoke and being in plays.

(*Id.*).

Mr. Treloar stated, "It is my belief, from a psychodynamic perspective, that the patient experiences symptoms when she is frustrated/angry because she is in a situation she does not want to be in, i.e., she has low frustration tolerance" (Tr. 653).

On April 15, 2019, Dynamic Psychotherapy Associates summarized Plaintiff's treatment and impairments (Tr. 753). The summary states Plaintiff had a significant

history of lying during childhood and early adolescence, including accusing her uncle of sexual molestation and faking symptoms to get disability benefits and get out of chores (*Id.*). Plaintiff's diagnoses included major depression, moderate, GAD; borderline personality disorder; and ambivalence toward work, anger at her parents, and anger at her brother with autism (*Id.*) The letter also states a rule-out diagnosis of malingering must be considered for the same reasons identified in Mr. Treloar's February 2019 letter (Tr. 753-54).

On March 18, 2019, Dr. Friesen wrote a letter addressing Mr. Treloar' suggestion that Plaintiff was malingering (Tr. 695). Dr. Friesen stated Plaintiff had been a patient with him for 10 years and that her symptoms had been fairly consistent (*Id.*). Dr. Friesen stated, "I do <u>not</u> think she is malingering, and I believe her inability to attain or maintain meaningful employment represents the vocational manifestation of the same struggles she has had throughout her troubled educational career" (*Id.*) (emphasis in original). Dr. Friesen also noted, "In my experience, [Plaintiff] has <u>wanted</u> to work and has wanted to feel like she is succeeding at something. She is obviously frustrated when things don't work out or when she feels like old patterns of failure and rejection are being repeated, yet again" (*Id.*) (emphasis in original). Dr. Friesen continued:

> Regarding times when she has participated in Karaoke- this is not indicative of an ability to work or a nullification of her disabilities. It simply illustrates the anxiety relieving capacity of alcohol, as she only sings Karaoke when intoxicated. As for her participated in plays in the past, it is not unusual for individuals with anxiety to be able to act. For them, it is not themselves as an individual who is being watched and judged- it is the part that they are playing, the <u>role</u> that is being watched. It gives them an opportunity to be something other than themselves, which is easier to do

when one is very uncomfortable with themselves or is even fully self-loathing.

(*Id.*) (emphasis in original).

Also, on April 12, 2019, Donna Bailey from ARC submitted a letter concerning Plaintiff's impairments in response to Mr. Treloar's statements about Plaintiff possibly malingering (Tr. 719). Ms. Bailey wrote:

> [Plaintiff] attended the sessions with [Mr. Treloar] with the intent on getting well. She wants to be able to learn how to deal with a stressful situation in a more productive positive manner. She longs to become independent and gainfully employed. However, she has not learned the necessary skills to achieve these goals. [Mr. Treloar] failed to teach her how to obtain the skills that would lead to a more productive life.
>
> I have worked with [Plaintiff] and her family for over 14 years and have experienced first-hand all the stressful events that [Plaintiff] and her brother have endured. I remain adamant in my belief that [Plaintiff] would benefit by receiving SSI. As I stated in my last letter, we are a non-profit agency and do not charge for any of our services.

(Tr. 720).

### d. Challenge Unlimited, Inc.

A Senior Placement Specialist from Challenge Unlimited, Inc. submitted an undated letter that states the agency was providing Plaintiff vocational rehabilitations for a few months (Tr. 596). Plaintiff had high levels of anxiety, which made finding and keeping a job very difficult (*Id.*). Plaintiff struggled with interviews and on one occasion had to leave the interview crying (*Id.*). Plaintiff had been hired at Golf Galaxy but was unable to work her first day due to anxiety (*Id.*). The Placement Specialist spent over an hour at Plaintiff's house that morning to encourage Plaintiff, but Plaintiff "just could not go in" (*Id.*). The Specialist contacted Plaintiff's employer, who was "open to allowing her

to come in the following day which she did" (*Id.*). Plaintiff did "okay" for a few weeks, but came very close to telling her employer she had to leave due to anxiety (*Id.*). Plaintiff was only able to work "very part time hours" (*Id.*). The Specialist noted Plaintiff was "highly motivated and truly" did want to work (*Id.*).

### e. John Frisbie, LCPC

On April 17, 2019, John Frisbie LCPC with Alliance Counseling Services PLLC wrote a letter to the ALJ in support of Plaintiff's disability claim (Tr. 807). Mr. Frisbie stated he began working with Plaintiff on March 14, 2019 for her diagnoses of major depressive disorder, PTSD, borderline personality disorder, and high expressed emotion level within family (*Id.*). Mr. Frisbie wrote, "It is my opinion that social security assistance is critical to [Plaintiff] better managing her symptoms and for her eventually achieving independence. Social Security will not only assist [Plaintiff's] mental health, it will help stabilize the health of her whole family" (*Id.*). Mr. Frisbie stated that major depressive disorder, PTSD, and borderline personality disorder "are known to make employment difficult. All three disorders together make stable, long-term and self-supportive employment tentative—even with consistent psychological treatment and dedicated social support" (*Id.*).

### f. Licensed Psychologist Shannon Walker, Ph.D.

On April 10, 2019, licensed psychologist, Shannon Walker, conducted an examination of Plaintiff (Tr. 704). Plaintiff's mood was depressed and anxious and her frustration tolerance was poor (*Id.*). Plaintiff was easily overwhelmed and anxious and her affect was labile (*Id.*). Plaintiff was tearful throughout the examination and

psychomotor agitation was noted (*Id.*). Her thought processes were coherent, logical, and goal-directed, her speech was within normal limits, and there were no hallucinations or delusions evidenced (*Id.*). Plaintiff's impulse control was adequate and no confusion was noted (*Id.*). Clinical impressions and diagnosis included borderline personality disorder, persistent depressive disorder, panic disorder, and generalized anxiety disorder (Tr. 707).

On April 22, 2019, Ms. Walker completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) (Tr. 714). Ms. Walker opined Plaintiff had marked limitations in understanding and remembering simple instructions, carrying out simple instructions, the ability to make judgments on simple work-related decisions, understanding and remembering complex instructions, and the ability to make judgments on complex work-related decisions (*Id.*). Ms. Walker stated Plaintiff has marked limitations in interacting with the public, interacting with supervisors, interacting appropriately with co-workers, and responding appropriately to usual work situations and to changes in a routine work setting (*Id.*).

### g. State Agency Consultant Opinions

On April 17, 2017, state agency consultant Dr. Howard Tin completed a records review of Plaintiff's medical history and determined Plaintiff's depressive, bipolar, and related disorders were non severe; her anxiety and obsessive compulsive disorders were non severe; and her ADHD was non severe (Tr. 75). On September 1, 2017, state agency consultant Dr. Donald Henson completed a records review of Plaintiff's medical history and determined Plaintiff's depressive, bipolar, and related disorders were non severe;

her anxiety and obsessive compulsive disorders were non severe; and her ADHD was non severe (Tr. 89).

## Analysis

Plaintiff argues the ALJ erred by failing to account for Plaintiff's deficits in concentration, persistence, or pace ("CPP") when formulating her residual functional capacity ("RFC"). "A disability claimant's RFC describes the maximum she can do in a work setting despite her mental and physical limitations." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). An RFC "must incorporate the totality of a claimant's limitations, including any deficiencies of concentration, persistence and pace." *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (internal alterations and quotations omitted). "Though an RFC assessment need not recite the precise phrase 'concentration, persistence, or pace,' any alternative phrasing must clearly exclude those tasks that someone with the claimant's limitations could not perform." *Paul v. Berryhill*, 760 F. App'x 460, 465 (7th Cir. 2019).

Here, the ALJ found Plaintiff had a moderate limitation with concentrating, persisting, or maintaining pace (Tr. 24) but had the RFC to perform a full range of work at all exertional levels, with the following non-exertional limitations: Plaintiff is unable to climb ladders/ropes/scaffolds; she should avoid all exposure to unprotected heights and use of dangerous moving machinery; *she is able to perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements involving only simple work-related decisions and routine workplace changes; and she is*

*able to perform work that is isolated from the public, with only occasional supervision and only occasional interaction with coworkers* (Tr. 25) (emphasis added).

The Seventh Circuit has repeatedly rejected the notion that confining an individual to simple, routine tasks and limited interactions with others always adequately captures moderate limitations in concentration, persistence, and pace. *Mischler*, 766 F. App'x at 376. Rather, there must be substantial evidence to support an RFC that limits a plaintiff with moderate CPP limitations to simple, routine, and repetitive tasks, and limited interactions with others. *See Recha v. Saul*, 843 F. App'x 1 (7th Cir. 2021). For instance, the Commissioner cites to a string of Seventh Circuit cases where the Court affirmed an ALJ's decision involving a claimant with moderate limitations in CPP and a corresponding RFC that restricts the claimant to simple, routine, and repetitive tasks (*see* Doc. 24, p. 4). In those cases, the ALJ's determination was logically connected to evidence in the record that supported the RFC determination. *See Recha*, 843 F. App'x at 3-5 (where the ALJ relied on state agency opinions that the plaintiff could maintain attention for two hours at a time and persist at simple tasks over eight- and forty- hour periods and there was no medical opinion that recommended limitations beyond those included in the RFC); *Lockett v. Saul*, 834 F. App'x 236 (7th Cir. 2020) (where the ALJ relied on testimony from a medical expert who expressly stated the plaintiff could perform simple, repetitive, routine work); *Bruno v. Saul*, 817 F. App'x 238 (7th Cir. 2020) (where the ALJ explained in detail that she limited the plaintiff to simple tasks based on evidence that the plaintiff's CPP struggles arose during complex undertaking, such as long tests but not during simple, repetitive tasks, such as the plaintiff's job at a bakery); *Jozefyk v. Berryhill*, 923 F.3d

492 (7th Cir. 2019) (where the evidence showed the plaintiff's CPP impairments surfaced only when he was around other people and the RFC adequately captured the context-specific limitation in CPP); *Burmester v. Berryhill*, 920 F.3d 507 (7th Cir. 2019) (where the ALJ relied on a narrative report from a state agency consultant who opined the plaintiff's limitations in CPP were manageable and the ALJ incorporated the consultant's findings in his hypothetical to the VE); *Dudley v. Berryhill*, 773 F. App'x 838 (7th Cir. 2019) (where the ALJ posed a hypothetical to the VE that adequately encompassed the plaintiff's restrictions in CPP and which went beyond those restrictions identified by the state agency consultants, who opined the plaintiff could perform simple, routine, and repetitive work activities); *Simons v. Saul*, 817 F. App'x 227 (7th Cir. 2020) (where the ALJ's hypothetical to the VE were consistent with limitations expressed in the medical record with regard to the plaintiff's CPP).

Here, the ALJ found Plaintiff had a moderate limitation in CPP (Tr. 24). The ALJ found the limitation based on Plaintiff's allegations of her inability to concentrate and complete tasks, and her inability to complete serial sevens during the consultative examination (Tr. 24). However, the ALJ opined Plaintiff demonstrated an ability to "ignore or avoid distractions while working" and "sustain an ordinary routine and regular attendance," because she played video games, watched television, and attended therapy sessions twice a week from October 2018 through February 2019 (Tr. 24). Although the ALJ explained how she determined Plaintiff's moderate CPP limitation at Step 3, the ALJ never explained how the limitation translated to the ultimate RFC finding at Step 4.

Unlike the cases cited by the Commissioner, the ALJ did not rely on any medical opinion that Plaintiff's moderate limitation in CPP was adequately encompassed by the RFC. *Cf. Lockett*, 834 F. App'x at 239 (where a medical expert testified the plaintiff could work in a "simple, repetitive, routine work environment with only occasional interaction with the public"); *Recha*, 843 F. App'x at 4 (where medical opinions in the record found the plaintiff could persist at "simple tasks"). Here, two state agency consultants concluded Plaintiff did not have any severe mental impairments at all, but the ALJ gave these opinions "little weight" because their conclusions were contradicted by the evidence and internally inconsistent (Tr. 28-29). On the other hand, Plaintiff introduced evidence from Dr. Friesen, her treating psychiatrist since 2009, that concluded Plaintiff's impairments made concentrating and retaining information difficult, continually interrupted her thoughts and focus, and limited her capacity for any employment (Tr. 597). Also, Mr. Schwartz, Plaintiff's clinical professional counselor since 2015, noted Plaintiff would have "significant difficulty maintaining" full-time employment and would "likely need an employment arranged that can accommodate [her] need to take breaks when needed to recover, end shifts if unable to recover, meetings to clarify management expectations or negotiate on-job concerns" (Tr. 636). Additionally, licensed psychologist Shannon Walker completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) and opined Plaintiff had marked limitations in understanding and remembering simple instructions, carrying out simple instructions, and the ability to make judgments on simple work-related decisions (Tr. 714).

Further, the ALJ did not rely on evidence that Plaintiff engaged in employment or job-related activities that demonstrate she can perform work in a manner consistent with the RFC determination. *Cf. Bruno*, 817 F. App'x at 242 (where the ALJ explained the plaintiff's job at a bakery demonstrated he could perform simple, repetitive tasks throughout the workday). To the contrary, there is evidence Plaintiff struggled to keep up with her employers' expectations and was unable to perform at work due to severe anxiety. For instance, Plaintiff was terminated from a job at a grocery store after three weeks because she "wasn't picking up on it quick enough and was slow at what she did learn" (Tr. 430). Plaintiff left a job as a painter because she "struggled keeping up with the expectation of the first day on the job," which triggered her anxiety (Tr. 423). Also, the evidence indicates Plaintiff's anxiety interfered with other employment opportunities at a gas station, Wal-Mart, Golf Galaxy, and more (Tr. 331, 337, 429, 431, 604).

Also, this is not a case where the ALJ relied on testimony from a VE who considered a hypothetical that adequately encompassed the plaintiff's limitations in CPP. "When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record." *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (internal quotations and citations omitted). Although the Seventh Circuit has "never required an ALJ to use the specific terminology of CPP," the hypothetical must "manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Recha*, 843 F. App'x at 4. Here, the ALJ asked the VE to consider an individual who could "perform simple, routine, and repetitive tasks in a work environment free of fast-paced

requirements involving only simple work-related decisions and routine workplace changes" (Tr. 65). As noted above, the ALJ did not connect the evidence with her conclusion that Plaintiff's moderate CPP impairments translate into an ability to perform simple, repetitive, and routine tasks over the course of a workday. *See Radosevich v. Berryhill*, 759 F. App'x 492 (7th Cir. 2019) (reversing an ALJ's decision where the hypothetical to the VE was incomplete because it only restricted the plaintiff to simple, work-related decisions, but did not account for restrictions in concentration, persistence, or pace).

However, the Commissioner argues Plaintiff's argument fails because she does not identify any additional limitations that should have been included in the RFC. But Plaintiff argues the ALJ found she suffered from nine severe psychiatric disorders, which impair her ability to concentrate and sustain attention to tasks nearly every day (Doc. 18, p. 9-10).

Finally, the Commissioner suggests that the Social Security Administration's revisions to the Regulations in 2017 alter the analysis concerning a plaintiff's moderate limitations in CPP and undermine Seventh Circuit case law pre-dating the revisions. The relevant Regulation now provides the following definitions:

    a. No limitation (or none). You are able to function in this area independently, appropriately, effectively, and on a sustained basis.

    b. Mild limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

    c. Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

    d.  Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis if seriously limited.

    e.  Extreme limitation. You are not able to function in this area independently, appropriate, effectively, and on a sustained basis.

20 C.F.R., Part 404, Subpart P, App. 1, § 12.00(F)(2).

These definitions "do not represent a departure from prior policy" and are "consistent with how [] adjudicators have understood and used those words" in the past. Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01. Also, the Seventh Circuit has continued to apply the same general principles governing cases involving moderate limitations in CPP, with no indication that the revised Regulation has altered the analysis. *See, e.g.*, *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019) ("When it comes to the RFC finding, we have likewise underscored that the ALJ generally may not rely merely on catch-all terms like "'simple, repetitive tasks'" because there is no basis to conclude that they account for problems of concentration, persistence or pace.") (citing *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015) and *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010)). The Commissioner's argument concerning the revised Regulation is unconvincing.

For the reasons explained above, the ALJ's RFC determination is not supported by substantial evidence. The ALJ failed to build a logical bridge between her determination that Plaintiff had a moderate limitation in CPP and the ultimate RFC finding. Although it is not this Court's role "to displace an ALJ's judgment by making our own findings

about the facts," the Court "cannot uphold an administrative determination that failed to explain the outcome adequately." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021).

<u>Conclusion</u>

The Commissioner's final decision denying application for Supplemental Security Income is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATE: March 29, 2022**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**